# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

**MARK FERNANDEZ,**

    **Plaintiff,**

vs.                                                                                **No. CIV 03-1334 RB/WDS**

**MORA-SAN MIGUEL ELECTRIC**
**COOPERATIVE, INC., LUCERO**
**PROFESSIONAL SERVICES, LTD.,**
**CARL ARMIJO, in his individual**
**capacity, ERNESTO GONZALES,**
**LEVI ALCON, and YVETTE ALCON,**

    **Defendants.**

## MEMORANDUM OPINION AND ORDER

    **THIS MATTER** came before the Court on Defendant Mora-San Miguel Electric Cooperative, Inc.'s ("Co-op's") Motion for Summary Judgment (Doc. 43), filed on June 11, 2004; Plaintiff ("Fernandez's") Cross Motion for Summary Judgment (Doc. 50), filed on July 1, 2004; Defendant Lucero Professional Services, LTD's ("LPS's") Motion for Summary Judgment (Doc. 71), filed on September 2, 2004; and the Co-op's Motion for Consolidation of Actions (Doc. 63), filed on August 16, 2004. Jurisdiction is founded upon 28 U.S.C § 1331. Having reviewed the submissions of the parties and the relevant law, I find that the Co-op's motion for summary judgment and Fernandez's cross motion for summary judgment should be denied, and that LPS's motion for summary judgment and the motion to consolidate should be granted.

**I. Background.**

    Fernandez was employed as a lineman by the Co-op. (Fernandez Depo. at 9.) On April 14,

2003, a compressor belonging to the Co-op was stolen.  (Fernandez Depo. at 57. )  After Fernandez failed a polygraph test administered in connection with the theft, the Co-op terminated his employment.  (Fernandez Depo. at 89.)

Fernandez filed a complaint in state court against the Co-op on September 19, 2003.  The Co-op removed the matter pursuant to 28 U.S.C.§ 1441 on November 20, 2003.  On March 18, 2004, Fernandez filed a second amended complaint, alleging (1) breach of express employment contract ("Count I"); (2) breach of implied employment contract ("Count II"); (3) retaliatory discharge ("Count III"); (4) breach of the covenant of good faith and fair dealing ("Count IV"); (5) prima facie tort ("Count V"); (6) violations of the Employee Polygraph Protection Act ("EPPA"), 29 U.S.C. § 2001-2009 ("Count VI"); (7) defamation against Ernesto Gonzales, Yvette Alcon, and Levi Alcon ("Count VII"); (8) defamation per se against Gonzales and Yvette Alcon ("Count VIII"); and (9) negligence against LPS ("Count IX").

The parties stipulated to dismissal of the claims against Gonzales, Yvette Alcon, and Levi Alcon.  Fernandez voluntarily dismissed his claims of retaliatory discharge and prima facie tort.

**II.    Facts.**

On April 14, 2003, Ernesto Gonzales, general manager of the Co-op, briefly questioned Fernandez about the missing compressor.  (Def. Ex. A at 57-58.)  On April 15, 2003, deputies from the Mora County Sheriff's Office began an investigation and spoke with Co-op employees.  (Def. Ex. A at 61.)  About a week later, two deputies interviewed Fernandez.  (Def. Ex. A at 64.)  About a month later, Carl Armijo, chief investigator with the District Attorney's Office, spoke with Fernandez about the case.  (Def. Ex. A at 67.)

Nicolas Leger, corporate counsel for the Co-op, testified at his deposition that he asked Armijo for a referral to a polygraph examiner. (Leger Depo. at 53.) Armijo referred Leger to Officer Gary Gold of the New Mexico State Police. (*Id*.) Officer Gold referred Leger to Eric Lucero of LPS. (*Id*.) In early July 2003, Leger called Lucero and stated that the Co-op wanted to obtain polygraph examinations of its employees in connection with a theft. (Leger Depo. at 51.) Lucero informed Leger that he could only administer polygraphs for criminal investigations, and not for employment purposes. (Leger Depo. at 75.) Leger set up the schedule and the location for the polygraphs. (Leger Depo. at 54; Pl. Ex. 3.) The Co-op paid for the polygraph examinations. (Leger Depo. at 65; Pl. Ex. 4.) Armijo forwarded the results of the polygraph examinations to the Co-op. (Leger Depo. at 74.)

Eric Lucero is the owner and operator of LPS. Lucero testified, at his deposition that two or three days after Leger called him, Lucero had a conversation with Armijo. (Lucero Depo. 10 at 21.) Armijo told Lucero that Armijo wanted to conduct polygraph tests for the criminal investigation into the compressor theft. (Lucero Depo. at 26; Armijo Depo. at 102.) Armijo related to Lucero that the compressor had been taken from a locked yard and the compressor had a special hitch that only Co-op vehicles could use. (Lucero Depo. at 27.)

Armijo explained to Lucero that Armijo wanted Fernandez, Don Abreu, Luciano Martinez, and Levi Alcon to undergo polygraph testing. (Lucero Depo. at 28.) Armijo referred to Abreu and Fernandez as potential suspects, and he referred to Martinez and Alcon as potential witnesses or persons with information about the crime. (*Id*.) Armijo informed Lucero that there had been two anonymous calls reporting that Abreu and Fernandez were responsible for the theft. (Lucero Depo. at 33.) Armijo explained that the polygraphs could not be conducted at the DA's office because the

3

DA was in the process of moving, but that a place for the examinations would be provided. (Lucero Depo. at 44.)

Lucero asked Armijo to set up the polygraphs. (Lucero Depo. at 45.) Lucero did not hear back from Armijo, but he did receive a fax from Leger informing Lucero that the polygraphs would take place at the Plaza Hotel on July10, 2004, and setting a schedule for the examinations. (Lucero Depo. at 45-46.) The fax also contained background information on the case. (*Id*.)

On July 10, 2003, Armijo advised Co-op employees that about fifteen of them were going to undergo polygraph testing. (Def. Ex. A at 70.) Don Abreu, a former Co-op line superintendent, testified at his deposition that even though Armijo had stated that polygraphs were voluntary, everyone was required to take them. (Abreu Depo. at 111-112.) On July 10, 2003, Gonzalez notified Co-op employees by memo that Levi Alcon, Luciano Martinez, Fernandez, and Abreu would be subjected to polygraph tests on July 11, 2003. (Pl. Ex. 9.)

When Lucero arrived at the Plaza Hotel on July 11, 2003, Leger and Deputy Roy Cordova of the Mora County Sheriff's Office were there. (Lucero Depo. at 46.) Lucero did not have any conversations with Cordova about the polygraphs before July 11, 2003. (Lucero Depo. at 19.) Fernandez reported for his polygraph test as instructed. (Def. Ex. A at 75.) After the polygraph, Lucero informed Fernandez that Fernandez had failed to test. (Def. Ex. A at 76.) The results were confirmed by sheriff's deputies the following week. (Def. Ex. A at 81.)

Following each polygraph examination, Lucero briefed Cordova on the preliminary results. (Lucero Depo. at 54.) At the end of the day, Lucero asked where to send the results and invoice. (Lucero Dep. at 55.) Cordova directed Lucero to send the original reports and the invoice to Armijo with copies of the reports to Cordova. (*Id*.) Lucero prepared reports summarizing his interpretation

4

of the results of the polygraph tests of Martinez, Levi Alcon, Fernandez, and Abreu. (Lucero Dep. at 55.) The reports stated that the test results of Martinez and Levi Alcon did not indicate deception, while the results for Fernandez and Abreu did indicate deception. (*Id*.) Lucero sent the original reports and the invoice to Armijo. (*Id*.)

On July 17, 2003, Leger called Lucero and stated that the Co-op would be paying for the polygraph examinations. (Lucero Depo. at 56.) Leger inquired as to the test results. (*Id*.) Lucero responded that he could not release the polygraph test results to Leger, but that Leger might be able to obtain the results from Armijo. (*Id*.) Prior to this conversation, Lucero believed that the District Attorney's Office would pay for the polygraph tests. (Lucero Depo. at 60.) After the conversation, Lucero faxed a copy of his invoice to Leger and the Co-op paid for the polygraph tests. (Lucero Depo. at 60; 108.)

Several weeks later, Leger contacted Lucero and asked whether Lucero would conduct polygraphs on an additional six Co-op employees. (Lucero Depo. at 62.) Lucero asked Leger if he could articulate reasonable suspicion that any of the six were responsible for the theft. (*Id*.) Leger replied that he could not. (*Id*.) Lucero told Leger that polygraph testing under those circumstances would be inappropriate. (*Id*.) Leger stated that he had received the results of the prior polygraph examinations from Armijo. (*Id*.) Lucero cautioned Leger, "look, the polygraphs that were conducted that day were for the criminal investigation. They were not meant for employment purposes. So you can't use them for that reason." (*Id*.)

On the morning of August 4, 2003, Gonzales instructed Fernandez to report to Leger's office. (Pl. Ex. 6.) At Leger's office, Fernandez stated that he wanted to speak to his attorney, Robert M. Ortiz. (*Id*.) Fernandez stepped outside the meeting and called Ortiz on a cell phone. (*Id*.) Ortiz

advised Fernandez and Leger that Fernandez would answer questions about the theft so long as Ortiz could listen and participate by speaker phone. (Pl. Ex. 1.) The parties dispute whether Fernandez refused to answer questions. A short time later, Leger came back on the line and advised Ortiz that they no longer needed to question Fernandez because they had decided to terminate Fernandez. (*Id.*) In his affidavit, Fernandez states that he cooperated in answering any questions asked about the missing compressor. (Pl. Ex. 6.)

In a letter dated August 5, 2003, the Co-op proposed to terminate Fernandez because Fernandez twice refused to answer questions about the missing compressor at the August 4, 2003 meeting. (Def. Ex. D.) A pre-termination hearing was set for August 7, 2003. (*Id.*) At the pre-termination hearing, Ortiz stated Fernandez's position. (Def. Ex. C.) Gonzalez stated in the letter that he found Fernandez's explanation as to why he refused to cooperate in the investigation of the missing compressor to be unsatisfactory. (*Id.*) The Co-op terminated Fernandez's employment effective August 8, 2003. (Fernandez Depo. at 92; Def. Ex. C.) Fernandez maintains that he was terminated without cause.

Gonzales testified at his deposition that law enforcement authorities never provided him with information that implicated Fernandez in the theft. (Gonzalez Depo. at 19.) Gonzalez did not know who took the compressor and he had no suspects. (Gonzalez Depo. at 21-22.)

**III. Standard.**

A motion for summary judgment may be granted only when "there is no genuine issue as to any material fact . . . the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact.'" *Muñoz v. St. Mary Corwin Hosp.*, 221 F.3d 1160, 1164 (10th Cir. 2000) (quoting Rule 56(c)). When applying this standard, the court examines the record and makes all reasonable inferences in the light most favorable to the non-moving party. *Id.*

The movant bears the initial burden of establishing that no genuine issue exists as to any material fact. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 289 (1968)). The movant's initial burden may be discharged by showing there is an absence of evidence to support the non-moving party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant meets its burden, the burden shifts to the non-moving party to demonstrate a genuine issue for trial on a material matter. *See McGarry v. Pitkin Co.*, 175 F.3d 1193, 1201 (10th Cir. 1999).

**IV. Discussion.**

**A.     Whether the Co-op is entitled to summary judgment on Counts I, II, and IV.**

In Counts I and II, Fernandez asserts a breach of express employment contract and breach of implied employment contract claims, respectively. In Count IV, he alleges breach of the implied covenant of good faith and fair dealing. The Co-op does not dispute that it had an employee handbook that gave rise to an implied contract of employment. The Co-op claims it is entitled to summary judgment because Fernandez was terminated for cause and because it followed proper procedures. Genuine issues of material fact remain in dispute as to whether there was cause for the

termination and whether the proper procedures were followed. The Co-op's motion for summary judgment on Counts I, II, and IV will be denied.

B.  **Whether summary judgment should be granted in favor of the Co-op or Fernandez on Count VI.**

In Count VI, Fernandez alleges that the Co-op engaged in a number of violations of EPPA. EPPA prohibits most private employers from discharging or disciplining employees based on results of polygraph tests. *See* 29 U.S.C. § 2002. The Act contains certain exceptions and procedural requirements for polygraph examinations. *See* 29 U.S.C. §§ 2006-2008. The Co-op argues that it is entitled to summary judgment because it did nothing more than cooperate with a criminal investigation. In his cross motion, Fernandez argues that he is entitled to summary judgment because the undisputed facts establish that the Co-op violated EPPA. Genuine issues of material fact remain in dispute with respect to these issues. *See Mennen v. Easter Stores*, 951 F.Supp. 838, 853 (N.D. Iowa 1997). The Co-op's motion for summary judgment and Fernandez's cross motion for summary judgment on Count VI will be denied.

C.  **Whether LPS is entitled to summary judgment.**

An "employer" is defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee or prospective employee." 29 U.S.C. § 2001(2). Although Fernandez did not plead an EPPA claim against LPS in his second amended complaint, he requests leave to amend his second amended complaint to allege that LPS violated EPPA. Because LPS does not object, the request to amend will be granted and the arguments concerning the EPPA claim against LPS will be addressed herein.

Fernandez argues that LPS qualifies as an employer within the meaning of the Act because

8

it acted in the interest of the Co-op.  In certain cases, a polygraph examiner may qualify as an employer under EPPA. *Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 726 (5th Cir. 2002). The determination of whether a polygraph examiner is an "employer" requires consideration of whether the examiner went beyond the role of an independent entity, to execute control as a matter of economic reality over the employer's compliance with EPPA.  *Rubin v. Tourneau, Inc.*, 797 F. Supp. 247, 252 (S. D. N. Y. 1992).  If the examiner is hired solely to administer an examination at the direction of the employer, the examiner, as a matter of economic reality, does not exert control over the employer's compliance with EPPA, and, is not subject to suit under EPPA.  *Id*.  Conversely, if the examiner determines such matters as who is to be tested and under what circumstances tests are permissible, the examiner would then be acting directly or indirectly in the employer's interest and would be subject to liability.  *Id*.

When examining the degree of control necessary to treat a polygraph examiner as an employer for purposes of EPPA, the relevant factors are whether the examiner (1) decided that a polygraph examination should be administered; (2) decided which employee would be examined; (3) provided expertise or advice to the employer regarding compliance with EPPA's requirements, or the employer relied on the examiner to ensure compliance; or (4) decided whether the examined employee would be subjected to disciplinary action, or merely reported the results of the polygraph examination to the employer.  *Calbillo*, 288 F.3d at 727.

Fernandez argues that Lucero decided that the polygraphs should be administered because Lucero informed Leger that he could only administer polygraphs for criminal investigations, and not for employment purposes.  Fernandez reasons that, when Armijo called Lucero a few days later, Lucero should have assumed that Leger contacted the District Attorney's Office and asked for

9

assistance in obtaining polygraphs of Co-op employees. Fernandez argues that the Co-op relied on LPS's advice on how to circumvent EPPA. Fernandez also relies on the fact that the Co-op paid for the polygraphs to establish that LPS acted in the interests of the Co-op.

The fact that the Co-op paid for the polygraph examinations is not dispositive of the issue of whether LPS qualifies as an employer. For instance, an employer is permitted to request an employee to submit to a polygraph test if the test is being administered in connection with an ongoing investigation involving such losses as theft and embezzlement.[1] *See* 29 U.S.C. § 2006(d). Although the employer pays for the polygraph examination in such cases, the examiner does not necessarily qualify as an employer. *See Calbillo*, 288 F.3d at 727; *Rubin*, 797 F. Supp. at 252; *Kluge v. O'Reilly Automotive, Inc.* 1994 WL 409575 (D. Kan. 1994); *Fallin v. Mindis Metals, Inc.*, 865 F. Supp. 834 (N. D. Ga. 1994). Moreover, Lucero was not aware until after he conducted the tests and submitted his bill to the District Attorney's Office that the Co-op would pay for the tests. While the payment may be relevant to the question of whether the Co-op violated EPPA, it is not relevant to the issue of whether LPS qualifies as an employer within the meaning of § 2001(2).

LPS has submitted evidence that Lucero informed Leger that LPS could only administer the polygraphs in conjunction with a criminal investigation. Lucero declined to work for the Co-op on two occasions. Armijo set up the polygraph examinations and informed Lucero which individuals would be subjected to the tests. Although Leger sent Lucero a schedule and arranged for a room for the tests, there is no evidence that LPS, as a matter of economic reality, exerted control over the Co-op's compliance with EPPA. The record does not support Fernandez's contention that LPS qualified as his employer under EPPA as alleged in Count VI.

---

[1] I express no opinion herein as to whether the Co-op would qualify for this exception.

In Count IX, Fernandez alleges that Lucero negligently facilitated the statutory violations of EPPA by permitting the polygraph examinations to take place. Fernandez has submitted no authority that distinguishes this claim from the EPPA claim alleged in Count VI. Summary judgment will be granted in favor of LPS on Counts VI and IX.

**D.     Whether the actions should be consolidated.**

The Co-op moves to consolidate the case styled *Abreu v. Mora-San Miguel Electric Cooperative, et al.*, and numbered CIV 03-1468 RB/RHS, with the instant action. Fernandez opposes this motion.

In deciding whether to consolidate cases, a court should initially determine if the pending actions share a common question of law or fact. *See* FED. R. CIV. P. 42(a). The instant case and the *Abreu* case share common questions and law and fact. Once the Court has determined that there are common questions of law or fact, it should then weigh the interests of judicial convenience in consolidating the cases against the delay, confusion, and prejudice consolidation might cause. *Servants of the Paraclete, Inc. v. Great Am. Ins. Co.*, 866 F. Supp. 1560, 1572 (D. N. M. 1994). Whether to grant a motion to consolidate under Rule 42(a) is within the trial court's discretion. *Id.*

Counsel has indicated that each case will require between four and five trial days. Due to the nature of the criminal docket in Las Cruces, I have a limited number of trial days to devote to civil cases. Summary judgment has been granted on the § 1983 claims in the *Abreu* case. The remaining causes of action and defendants in each case are now the same. Considerations of judicial convenience greatly outweigh the possibility of delay, confusion or prejudice. The motion to consolidate will be granted.

**WHEREFORE,**

**IT IS ORDERED** that the Co-op's Motion for Summary Judgment (Doc. 43), filed on June 11, 2004, is **DENIED.**

**IT IS FURTHER ORDERED** that Fernandez's Cross Motion for Summary Judgment (Doc. 50), filed on July 1, 2004, is **DENIED.**

**IT IS FURTHER ORDERED** that LPS's Motion for Summary Judgment (Doc. 71), filed on September 2, 2004, is **GRANTED.**

**IT IS FURTHER ORDERED** that the Co-op's Motion for Consolidation of Actions (Doc. 63), filed on August 16, 2004, is **GRANTED.**

*/s/ Robert Brack*

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**