# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**MARK FERNANDEZ,**

      **Plaintiff,**

**vs.**                                                                 **No. CIV 03-1334 RB/WDS**

**MORA-SAN MIGUEL ELECTRIC
COOPERATIVE, INC., LUCERO
PROFESSIONAL SERVICES, LTD.,
CARL ARMIJO, in his individual
capacity, ERNESTO GONZALES,
LEVI ALCON, and YVETTE ALCON,**

      **Defendants,**

**consolidated with,**

**DON ABREU,**

      **Plaintiff,**

**vs.**                                                                 **No. CIV 03-1468 RB/RHS**

**MORA-SAN MIGUEL ELECTRIC
COOPERATIVE, INC., MORA COUNTY
SHERIFF'S OFFICE, FOURTH JUDICIAL
DISTRICT ATTORNEY'S OFFICE, LUCERO
PROFESSIONAL SERVICES, LTD.,
CARL ARMIJO, in his official and individual
capacities, ERNESTO GONZALES,
LEVI ALCON, and YVETTE ALCON,**

      **Defendants.**

## CORRECTED MEMORANDUM OPINION AND ORDER[1]

---

[1] This Corrected Memorandum Opinion and Order is issued for the purpose of correcting a misstatement on page 20 of the original Memorandum Opinion and Order that the Co-op was relying on the ongoing investigation exception in response to Abreu's motion for summary judgment on the EPPA claim, and a misstatement on page 22 of the original Memorandum Opinion and Order that the Co-op's motion for summary judgment was denied as to Count III.  The corrected statements are that the Co-op argued that it passively cooperated with the police in the course of their investigation on page 21 of the Corrected Memorandum Opinion and Order, and that the Co-op's motion for summary judgment was denied as to Count IV on page 23 of the Corrected Memorandum Opinion and Order.

**THIS MATTER** came before the Court on Defendant Mora-San Miguel Electric Cooperative, Inc.'s ("Co-op's") Motion for Summary Judgment as to Counts I-V and X-XIII (Doc. 50), filed on September 3, 2004; Defendant Co-op's Motion for Summary Judgment Barring Recovery of Damages for Lost Wages/Benefits Based on Failure to Mitigate Damages (Doc. 54), filed on September 20, 2004; Defendants Carl Armijo and the Fourth Judicial District Attorney's Office's ("DAO Defendants'") Motion for Summary Judgment (Doc. 67), filed on October 13, 2003; Defendant Lucero Professional Services, LTD's ("LPS's") Motion for Summary Judgment (Doc. 69), filed on October 13, 2004; and Plaintiff's ("Abreu's") Motion for Summary Judgment on Count VI Against the Co-op (Doc. 71), filed on October 14, 2004.

Jurisdiction is founded upon 28 U.S.C § 1331. Having reviewed the submissions of the parties and the relevant law, I find that the DAO Defendants' motion and LPS's motion should be granted, that the Co-op's motions should be granted in part and denied in part, and that Abreu's motion should be denied.


**I. Background.**

Abreu was employed as a line superintendent by the Co-op. (Def. Ex. A.) On April 14, 2003, the Co-op reported the theft of a compressor to the Mora County Sheriff's Office ("MCSO"). (Undisputed Fact No. 3.) After Abreu failed a polygraph test administered in connection with the theft, the Co-op terminated his employment.

Abreu filed his complaint in state court on December 2, 2003, asserting (1) breach of express employment contract ("Count I"); (2) breach of implied employment contract ("Count II"); (3) retaliatory discharge ("Count III"); (4) breach of the covenant of good faith and fair dealing ("Count

IV"); (5) prima facie tort ("Count V"); (6) violations of the Employee Polygraph Protection Act ("EPPA"), 29 U.S.C. § 2001-2009 ("Count VI"); (7) defamation against Ernesto Gonzales, Yvette Alcon, and Levi Alcon ("Count VII"); (8) defamation per se against Gonzales and Yvette Alcon ("Count VIII"); (9) conspiracy to violate constitutional rights against Carl Armijo, the District Attorney's Office ("DAO"), and the Mora County Sheriff's Office ("MCSO") under the New Mexico Tort Claims Act ("NMTCA") ("Count IX"); (10) conspiracy to violate constitutional rights against the Co-op, the DAO, and MCSO under §1983 ("Count X"); (11) violation of substantive due process (property interest) against the Co-op, the DAO, and MCSO under §1983 ("Count XI"); (12) violation of substantive due process (liberty interest) against the Co-op, the DAO, and MCSO under §1983 ("Count XII"); (13) violation of procedural due process against the Co-op, the DAO, and MCSO under §1983 ("Count XIII"); and (14) negligence against LPS ("Count XIV").

On December 29, 2003, the DAO Defendants removed the matter pursuant to 28 U.S.C.§ 1441. The parties stipulated to dismissal of the claims against the MCSO, Gonzales, and Levi Alcon. Abreu voluntarily dismissed his claims of retaliatory discharge, prima facie tort, and defamation.

On January 28, 2004, the DAO Defendants' motion for judgment on the pleadings was granted (1) as to Counts X, XI, XII, and XIII with respect to the DAO on the ground that the DAO is not a person within the meaning of §1983, (2) as to Count IX with respect to the DAO Defendants on the basis that the law enforcement waiver of the NMTCA does not apply to the DAO Defendants because they are not law enforcement officers within the meaning of the waiver; and (3) as to Counts I, II, III, IV, V, and VI on the grounds that Abreu did not respond to the arguments raised by the DAO Defendants and those counts did not name the DAO Defendants. Although they were raised in the motion for judgment on the pleadings, the issues of whether Abreu had presented sufficient

3

facts to establish a conspiracy under §1983 and Armijo's assertion of qualified immunity were reserved for discussion herein.

## II.     Facts.

MCSO Corporal Roy Cordova testified, at his deposition, that he was dispatched to the investigate the compressor theft on April 14, 2003. (Cordova Depo. at 32.)  Because the compressor was stolen from a locked yard and there were no signs of forced entry, Cordova suspected that a Co-op employee was responsible.  (Cordova Depo. at 33.)  Cordova decided to interview all Co-op employees who had access to the lock combination.  (Cordova Depo. at 40.)

Ernesto Gonzales, manager of the Co-op, furnished Cordova with the names of employees who had access to the lock combination.  (Cordova Depo. at 39.)  Gonzales also turned over cell phone records and mileage logs for Co-op linemen who were assigned to drive trucks capable of towing the compressor.  (Cordova Depo. at 42-43.)  In supplemental report, dated May 1, 2003, Cordova documented the fact that Gonzales had provided him with the documents.  (Pl. Ex. 7.)

Cordova was unable to pinpoint any suspects from the mileage and phone logs.  (Cordova Depo. 22-23.)  Cordova never had any conversations with anyone from the DAO about the case. (Cordova Depo. at 13.)  In June 2003, Cordova went on vacation and, when he returned, the DAO had taken over the case.  (Cordova Depo. at 18-19.)

Cordova testified that, on July 10, 2003, Carl Armijo, the DAO's chief investigator, called Cordova and asked Cordova to accompany Armijo to a meeting with Co-op employees where Armijo asked the employees to take polygraph tests.  (Cordova Depo. at 26.)  Cordova was present outside the room when the polygraph examinations were taken.  (Cordova Depo. at 28.)  Cordova believed

that the DAO paid for the polygraph tests.  (Cordova Depo. at 46.)  Cordova had no idea why all Co-op employees who had access to the yard and trucks were not given polygraph tests.  (Cordova Depo. at 30.)  Cordova continued to investigate after October 2003.  (Cordova Depo. at 11.)  As of June 1, 2004, the MCSO investigation into the theft was still open.  (*Id.*)

Fourth Judicial District Attorney Matthew Sandoval testified, at his deposition, that Nick Leger, counsel for the Co-op, approached Sandoval and expressed dissatisfaction with the MCSO's investigation of the theft.  (Sandoval Depo. at 8.)  Leger told Sandoval that there was some evidence that it might be an internal theft.  (*Id.*)  Sandoval assigned Armijo to assist with the investigation.  (Sandoval Depo. at 8-9.)  Leger did not ask Sandoval to obtain a polygraph to use in a civil employment dispute.  (Sandoval Depo. at 41.)

Sandoval testified that Armijo had authority to arrange for polygraph examinations.  (Sandoval Depo. at 20.)  On July 11, 2003, Armijo informed Sandoval that polygraph examinations of Co-op employees were going to be taken on that day.  (Sandoval Depo. at 21.)  Sandoval called the MCSO to remind them to have a deputy present during the polygraph tests.  (*Id.*)

Sandoval believed that the polygraphs were taken in furtherance of the DAO's criminal investigation.  (*Id.*)  Sandoval explained that a polygraph examination can be an effective tool in a criminal investigation, especially in a case involving a work-place theft with several suspects.  (Sandoval Depo. at 36.)  Sandoval had no belief that the polygraph results would be used in a civil employment dispute.  (Sandoval Depo. at 42.)

Sandoval testified that the DAO has a policy of keeping crime victims informed of investigation results.  (Sandoval Depo. at 47-48.)  In this case, the Co-op was a crime victim.  (Sandoval Depo. at 48.)  The DAO frequently assisted local law enforcement with investigations.

5

(Sandoval Depo. at 55.)   The DAO investigation of the theft still open as of August 3, 2004.
(Sandoval Depo. at 46.)

Armijo testified, at his deposition, that Sandoval directed Armijo to contact Leger about the
theft.  (Armijo Depo. at 11.)  Armijo contacted Leger, who related that the compressor was missing
and that the Co-op believed it had some suspects and eyewitnesses.  (*Id.*)  Armijo spoke with
Cordova about the case on several different occasions.  (Armijo Depo. at 11; 23-24.)  During the
course of assisting Cordova with the investigation, Armijo contacted Luciano Martinez, Levi Alcon,
Yvette Alcon, Ernesto Gonzales, Abreu, and Mark Fernandez individually.  (Armijo Depo. at 12.)

Armijo testified that Cordova told Armijo that Levi Alcon and Martinez were interested in
taking polygraphs because they were concerned for their safety and well-being, but that the MCSO
did not have the funds to pay for the tests.  (Armijo Depo. at 11-12.)  Leger and Gonzales told
Armijo that the Co-op was willing to pay for the polygraph examinations.  (Armijo Depo. at 12-13.)

Armijo testified that Armijo and Cordova jointly requested the mileage logs and phone records
from the Co-op.  (Armijo Depo. at 67.)  The DAO did not have a file on the case. (Armijo Depo. at
6.)  On June 4, 2003, Nicolas Leger, attorney for the Co-op, forwarded copies of time sheets, phone
bills, and mileage logs for Co-op employees with access to the yard and trucks to  Armijo.  (Pl. Ex.
8.)  Armijo turned over everything he received to Cordova.  (Armijo Depo. at 67.)

Armijo testified that Cordova asked Armijo to speak to the Co-op employees about the
polygraph tests.  (Armijo Depo. at 13.)  Armijo explained that the authorities were looking for the
stolen compressor, there were possible eyewitnesses, and the compressor was taken on Sunday night
by a Co-op vehicle.  (*Id.*)  Armijo asked if the employees were willing to take a polygraph test, and
all of the employees indicated that they were willing to do so.  (*Id.*)

Armijo testified that Gonzales gave Armijo the names of employees who were suspects: Abreu, Fernandez, Martinez, Levi Alcon, Ray Chavez, and Gonzales. (Armijo Depo. at 14.) These individuals drove the type of truck that Yvette Alcon had reported that she saw outside the equipment yard. (Armijo Depo. at 15 and 17.) Gonzales and Chavez were not given polygraph tests. (Armijo Depo. at 18.) Armijo did not know why all the employees who had access to the yard and the trucks were not subjected to polygraphs. (Armijo Depo. at 18-19.) On the day of the polygraphs, Armijo left after Cordova arrived because he was busy with other cases. (Armijo Depo. at 49.)

Armijo interviewed Yvette Alcon by telephone. (Armijo Depo. at 16.) Alcon told him that she had gone gambling with her sister or sister-in-law, and that on their way back, they observed two trucks in the Co-op yard. (*Id*.) When she dropped her sister off at the Allsups, they saw one truck pulling the compressor, and another truck following the first truck. (*Id*.)

Armijo believed that the polygraph tests were an investigative tool. (Armijo Depo. B at 92.) Armijo had no idea that the polygraphs would have any effect on the subjects' employment at the Co-op. (Armijo Depo. at 98; 100.) Armijo testified that Cordova and Armijo directed the polygraph examiner to forward the polygraph results to the Co-op. (Armijo Depo. at 108.) No one at the Co-op asked Armijo to obtain polygraphs. (Armijo Depo. at 112-13.) Armijo was unaware of any internal investigation conducted by the Co-op. (Armijo Depo. at 80.) No one has been arrested or charged in the case. (Armijo Depo. at 29.)

Nicolas Leger is corporate counsel for the Co-op and advised the Co-op during the events at issue. Leger testified, at his deposition, that he asked Armijo for a referral to a polygraph examiner. (Leger Depo. at 53.) Armijo referred Leger to Officer Gary Gold of the New Mexico State Police. (*Id*.) Officer Gold referred Leger to Eric Lucero of LPS. (*Id*.) In early July 2003,

Leger called Lucero and stated that the Co-op wanted to obtain polygraph examinations of its employees in connection with a theft. (Leger Depo. at 51.) Lucero informed Leger that he could only administer polygraphs for criminal investigations, and not for employment purposes. (Leger Depo. at 75.) Leger set up the schedule and the location for the polygraphs. (Leger Depo. at 54.) The Co-op paid for the polygraph examinations. (Leger Depo. at 65.) Armijo forwarded the results of the polygraph examinations to the Co-op. (Leger Depo. at 74.)

Eric Lucero is the owner and operator of LPS. Lucero testified, at his deposition that, about two or three days after Leger called him, Lucero had a conversation with Armijo. (Lucero Depo. at 21.) Armijo told Lucero that Armijo wanted to conduct polygraph tests for the criminal investigation into the compressor theft. (Lucero Depo. at 26; Armijo Depo. at 102.) Armijo related to Lucero that the compressor was missing from a locked yard and the compressor had a special hitch that only Co-op vehicles could use. (Lucero Depo. at 27.)

Armijo explained to Lucero that Armijo wanted Abreu, Fernandez, Luciano Martinez, and Levi Alcon to undergo polygraph testing. (Lucero Depo. at 28.) Armijo referred to Abreu and Fernandez as potential suspects, and he referred to Martinez and Alcon as potential witnesses or persons with information about the crime. (*Id*.) Armijo informed Lucero that there had been two anonymous calls reporting that Abreu and Fernandez were responsible for the theft. (Lucero Depo. at 33.) Armijo explained that the polygraphs could not be conducted at the DA's office because the DA was in the process of moving, but that a place for the examinations would be provided. (Lucero Depo. at 44.)

Lucero asked Armijo to set up the polygraphs at 8:00 a.m., 10:00 am., 1:00 p.m. and 3:00 p.m. (Lucero Depo. at 45.) Lucero did not hear back from Armijo, but he did receive a fax from

8

Leger informing Lucero that the polygraphs would take place at the Plaza Hotel and setting a schedule for the examinations.  (Lucero Depo. at 45-46.)  The fax also contained background information on the case.  (*Id*.)  When Lucero arrived at the hotel, Leger and Cordova were there.  (Lucero Depo. at 46.)  Lucero did not have any conversations with Cordova about the polygraphs before July 11, 2003.  (Lucero Depo. at 19.)

Following each polygraph examination, Lucero briefed Cordova on the preliminary results.  (Lucero Depo. at 54.)  Martinez and Alcon passed, but the results for Fernandez and Abreu indicated deception.  (*Id*.)  At the end of the day, Lucero asked where to send the results and invoice.  (Lucero Dep. at 55.)  Cordova directed Lucero to send the original reports and the invoice to Armijo with copies of the reports to Cordova.  (*Id*.)

Lucero prepared reports summarizing his interpretation of the results of the polygraph tests of Martinez, Levi Alcon, Fernandez, and Abreu.  (Lucero Dep. at 55.)  The reports stated that the test results of Martinez and Levi Alcon did not indicate deception, while the results for Fernandez and Abreu did indicate deception.  (*Id*.)  Lucero sent the original reports and the invoice to Armijo.  (*Id*.)

On July 17, 2003, Leger called Lucero and stated that the Co-op would be paying for the polygraph examinations.  (Lucero Depo. at 56.)  Leger inquired as to the test results.  (*Id*.)  Lucero responded that he could not release the polygraph test results to Leger, but that Leger might be able to obtain the results from Armijo.  (*Id*.)  Prior to this conversation, Lucero believed that the DAO would pay for the polygraph tests.  (Lucero Depo. at 60.)  After the conversation, Lucero faxed a copy of his invoice to Leger and the Co-op paid the invoice.  (Lucero Depo. at 60; 108.)

Several weeks later, Leger contacted Lucero to ask whether he would conduct polygraphs

on an additional six employees.  (Lucero Depo. at 62.)  Lucero asked Leger if he could articulate

reasonable suspicion that any of the six were responsible for the theft.  (*Id.*)  Leger replied that he

could not.  (*Id.*)  Lucero told Leger that polygraph testing under those circumstances would be

inappropriate.  (*Id.*)  Leger stated that he had received the results of the prior polygraph examinations

from Armijo.  (*Id.*)  Lucero cautioned Leger, "look, the polygraphs that were conducted that day

were for the criminal investigation.  They were not meant for employment purposes.  So you can't use

them for that reason."  (*Id.*)

Ernesto Gonzales is the general manager of the Co-op.  Gonzales testified in his deposition

that, in April 2003, Luciano Martinez and other Co-op linemen spontaneously volunteered to take

polygraph tests to clear their names.  (Gonzalez Depo. at 95.)  In July 2003, Armijo notified Gonzalez

that Armijo wanted to have a meeting with Co-op employees on July 10, 2003 to discuss the

polygraphs.  (Gonzalez Depo. at 97.)  Armijo told Gonzalez that he wanted to take the polygraphs

as part of the ongoing investigation and that the polygraphs were voluntary.  (*Id.*)  Gonzales

authorized payment for the polygraphs on July 22, 2003.  (Gonzalez Depo. at 108.)

Gonzales testified that, from the April 2003 instance where the lineman asked to undergo

polygraph tests, until the July 2003 conversation with Armijo, Gonzales did not recall any

communications with anyone with regard to polygraph testing of Co-op employees.  (Gonzalez Depo.

at 95.)  Gonzales testified that no one from the MCSO or the DAO ever formally sat down with him

for a tape-recorded interview.  (Gonzalez Depo. at 40-41.)  However, Gonzales testified that "they

would always come in and say 'I need to talk to so and so.'"  (Gonzalez Depo. at 41.)  Gonzalez has

never spoken to Lucero.  (Gonzalez Depo. at 96.)

At its May 19, 2003 meeting, the Co-op Board authorized management to spend up to

$1,200.00 on polygraph testing in conjunction with the investigation of the compressor theft.  (Pl. Ex. 14.)  Leger and Gonzalez the next Board meeting on June 24, 2003.  (*Id*.)  After a closed, executive session, the Board voted to increase the amount authorized for polygraph testing.  (*Id*.)  After the polygraph vote, Leger was excused.  (*Id*.)  Gonzales was presumably present for the discussion of the polygraph issue.  On July 22, 2003, the Co-op paid $1,565.45 to LPS for the polygraph examinations.  (Pl. Ex. 13.)

Luciano Martinez testified in his deposition that, in April 2003, some of the linemen volunteered to take polygraph examinations to clear their names and because they were afraid. (Martinez Depo. at 36-37.)  Martinez testified that he was "not really" interviewed by anyone from the DAO.  (Martinez Depo. at 98.)

Levi Alcon is the spouse of witness of Yvette Alcon.  Levi Alcon testified in his deposition that he went to Armijo's office and "had a conversation" with him about the case.  (Alcon Depo. at 73.)

Abreu testified in his deposition that, even though Armijo stated that polygraphs were voluntary, everyone was required to take them.  (Abreu Depo. at 111-112.)  Abreu understood that the DAO was "still looking into the disappearance" of the compressor at the time of the polygraphs. (Abreu Depo. at 64.)  On July 16, 2003, Corporal Cordova and Deputy Kirby interviewed Abreu, read him his rights, asked him if he would like to answer questions.  (Abreu Depo. at 109.)  Abreu refused to answer questions.  (*Id*.)  In supplemental report dated July 16, 2003, Cordova stated that the matter was still under investigation by the MCSO.  (*Id*.)

Abreu testified that, about a month after the polygraph, Abreu was called into Leger's office for a meeting with Gonzales and presented with a pre-termination letter.  (Abreu Depo. at 108.)  On

11

August 5, 2003, a pre-termination letter was hand delivered to Abreu.  (Pl. Ex. 16.)  The factual basis for the proposed termination was Abreu's failure of the polygraph test and an eyewitness placing Abreu's company truck at the equipment yard in Mora on the night of April 13, 2003.  (*Id*.)  A pre-termination hearing was held on November 4, 2003, and Abreu was terminated on November 14, 2003.  (Pl. Ex. 17.)

### III.  Standard.

A motion for summary judgment may be granted only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact.'"  *Muñoz v. St. Mary Corwin Hosp.*, 221 F.3d 1160, 1164 (10th Cir. 2000) (quoting Rule 56(c)).  When applying this standard, the court examines the record and makes all reasonable inferences in the light most favorable to the non-moving party.  *Id*.

The movant bears the initial burden of establishing that no genuine issue exists as to any material fact.  *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 289 (1968)).  The movant's initial burden may be discharged by showing there is an absence of evidence to support the non-moving party's case.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant meets its burden, the burden shifts to the non-moving party to demonstrate a genuine issue for trial

on a material matter.  *See McGarry v. Pitkin Co.*, 175 F.3d 1193, 1201 (10th Cir. 1999).


**IV.  Discussion.**

**A.     Whether Armijo and the Co-op are entitled to summary judgment on Count X.**

In Count X, Abreu asserts a §1983 conspiracy claim against the Armijo and the Co-op.[2]

Allegations of conspiracy may form the basis of a §1983 claim.  *Hunt v. Bennett*, 17 F.3d 1263, 1266

(10th Cir. 1994).  A conspiracy requires the combination of two or more persons acting in concert.

*Salehpoor v. Shahinpoor*, 358 F.3d 782, 789 (10th Cir. 2004).  To establish a §1983 conspiracy claim,

a plaintiff must establish specific facts showing an agreement and concerted action among the

defendants.  *Id.*; *Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 533 (10th Cir. 1998).

Abreu argues that the Co-op and Armijo agreed that the Co-op would use the offices and

authority of the DAO to conduct the polygraph examinations for the sole unlawful purpose of

allowing the Co-op to obtain polygraphs of its employees.  Abreu has presented no evidence that

there was an agreement between Armijo and the Co-op to use the DAO's authority to conduct the

polygraphs for the Co-op.  To the contrary, the record affirmatively demonstrates that Armijo was

actively involved in the criminal investigation of the theft.  Armijo interviewed witnesses, both

formally and informally, and obtained documentary evidence.[3]  Both Sandoval and Armijo testified

that polygraph examinations are useful in criminal investigations; Abreu has presented no evidence

to the contrary.

---

[2] The §1983 claims against the DAO and the MCSO have been dismissed.

[3]Abreu's argument that conversations with witnesses and suspects do not qualify as investigative interviews is not well-taken.  I take judicial notice that informal telephone conversations with witnesses and suspects may form the basis for a criminal investigation.

Abreu equates Armijo's knowledge that the Co-op wanted to polygraph some of its employees with the assumption that any subsequent polygraph testing was conducted pursuant to a conspiracy. This assumption is unsupported by the record. Abreu depends on innuendo and speculation based on inconsistencies in the evidence. For instance, Gonzalez testified that from April until July 2003 he had no communications with anyone regarding polygraphs of Co-op employees. However, the Co-op board meeting minutes reflect that Gonzales attended a board meeting on June 23, 2003, where polygraphs were discussed. Similarly, Armijo testified that he spoke with Cordova about the investigation on several occasions. Cordova testified that no one from the DAO contacted him about the case until July 11, 2003. The inconsistencies do not establish that there was an agreement between defendants to circumvent EPPA and obtain polygraph testing for the Co-op.

Abreu has cited no authority for the proposition that a district attorney investigator is barred from communicating with a crime victim about an on-going investigation, or that a crime victim is barred from contributing resources to assist with an investigation. Tenth Circuit authority holds to the contrary. Parallel action does not indicate an agreement to act in concert and does not form the basis for a §1983 conspiracy claim. *See Hammond v. Bales*, 843 F.2d 1320, 1322-23 (10th Cir. 1988). Communication between alleged co-conspirators is insufficient to establish a conspiracy. *See Salehpoor*, 358 F.3d at 789. Adverse action against a plaintiff by an alleged co-conspirator is similarly unavailing. *See Sooner Products Co. v. McBride*, 708 F.2d 510, 512 (10th Cir. 1983). Friendships and subsequent employment relationships between alleged conspirators have been held insufficient to support a claim for conspiracy. *See Hammond*, 843 F.2d at 1323; *Sooner Products*, 708 F.2d at 512.

Defendants have come forward with evidence that Armijo requested the polygraph

14

examinations pursuant to an on-going criminal investigation.  No evidence indicates that the Co-op

asked Armijo to arrange for the polygraph tests, or that Armijo agreed to set up the polygraph tests

for the Co–op.  Abreu has failed to submit any evidence that there was an agreement or concerted

action between the Co-op and Armijo.  Because there is no evidence of a conspiracy, summary

judgment will be granted in favor of Defendants Count X, the §1983 conspiracy claim.

**B.     Whether Armijo and the Co-op are entitled to summary judgment on Counts XI, XII, and XIII.**

Counts XI, XII, and XIII currently consist of §1983 claims against Armijo and the Co-op.

In Count XI, Abreu alleges violation of substantive due process (property interest) with respect to

the loss of his job.  In Count XII, Abreu alleges violation of substantive due process (liberty interest)

with respect to the loss of his reputation and good standing in the San Miguel County community.

In Count XIII, Abreu alleges violation of procedural due process because he did not receive adequate

notice and a hearing before he was deprived of his employment and reputation.

Section 1983 applies only to those defendants who act under color of state law.  *See Pino v.*

*Higgs*, 75 F.3d 1461, 1464 (10th Cir.1996).  A private entity, such as the Co-op, may be held liable

under § 1983 only if the plaintiff shows that the entity's conduct is fairly attributable to the state.

*Pino*, 75 F.3d at 1465; *see also Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1447-57

(10th Cir. 1995) (discussing the various tests for determining state action).

Abreu argues that the Co-op qualifies as a state actor because there was a close nexus

between the actions of the Co-op and Armijo and the Co-op and Armijo engaged in joint action.[4]

---

[4] Abreu also relied on the alleged conspiracy to establish the requisite state action.  *See*
*Hammond*, 843 F.2d at 1323.  As more fully discussed *supra*, Defendants are entitled to summary
judgment on the §1983 conspiracy claim.

Under the close nexus test, a plaintiff must demonstrate that there is a sufficiently close nexus between the government and the challenged conduct such that the conduct may be fairly treated as that of the state. *Gallagher*, 49 F.3d at 1448. "[A] state normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Id.* Merely availing oneself to state judicial procedures is insufficient to constitute state action. *Johnson v. Rodrigues*, 293 F.3d 1196, 1203 (10th Cir. 2002).

Abreu has presented no evidence that the Armijo exercised coercive power over the Co-op or provided significant encouragement to the Co-op. The Co-op decided to report the theft to the MCSO and DAO. A private entity does not engage in state action simply by availing itself to state procedure. *Scott v. Hern*, 216 F.3d 897, 906 (10th Cir. 2000). During the course of the investigation, Armijo decided to obtain polygraphs. There is no evidence that Abreu participated in the decision to terminate Abreu's employment. Thus, no nexus existed between the actions of the Co-op and Armijo. Abreu has failed to demonstrate that the Co-op qualifies as a state actor by virtue of the close nexus test.

The joint action test is satisfied if the plaintiff shows that a private party is a willful participant in joint action with a state agent. *Gallagher*, 49 F.3d at 1453. When applying this analysis, courts generally "examine whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights." *Id.* Abreu has submitted no evidence that Armijo was involved in the Co-op's decision to terminate Abreu. Armijo participated in a criminal investigation of the theft. The record establishes that Abreu was a suspect because he had access to the equipment yard and a Co-op truck. There is no evidence that the actions of Armijo deprived Abreu of his

reputation, community standing, or any other liberty or property interest.  Because there was no state action with respect to the alleged §1983 claims, summary judgment will be granted in favor of Defendants on Counts XI, XII, and XII.  Because summary judgment will be granted in his favor, it is not necessary to address Armijo's assertion of qualified immunity.

**C.     Whether the DAO Defendants and LPS are entitled to summary judgment on Count VI, the EPPA claim.**

**(1) The DAO Defendants.**

On January 28, 2005, the EPPA claim was dismissed as to the DAO Defendants because Abreu failed to respond to the arguments raised with respect to this issue in the DAO Defendant's motion for judgment on the pleadings.  However, the DAO Defendants argued in their motion for summary judgment that EPPA is inapplicable to them because they were not Abreu's employers within the meaning of the Act.  Abreu has responded to this argument.  Because Abreu has responded to this argument, and it was not addressed on the merits in the January 28, 2004 Memorandum Opinion and Order, the issue of whether the EPPA is applicable to the DAO Defendants will be addressed herein.

EPPA prohibits most private employers from discharging or disciplining employees based on results of polygraph tests.  29 U.S.C. § 2002.  An "employer" is defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee or prospective employee."  29 U.S.C. § 2001(2).  Abreu has presented no evidence that the DAO Defendants acted directly or indirectly in the interest of the Co-op when they arranged for the polygraphs.  Although Armijo referred Leger to Officer Gold, there is no evidence that the DAO Defendants provided expertise or advice to the Co-op regarding compliance with EPPA's requirements, or that they decided whether

17

Abreu would be terminated.  Abreu has presented no authority in support of the theory that EPPA prohibits a district attorney's office from obtaining polygraph examinations of criminal suspects.[5] Accordingly, the DAO Defendants are entitled to summary judgment on Count VI.

**(2)   LPS**

Although Abreu did not plead an EPPA claim against LPS in his complaint, he requests leave to amend his complaint to allege that LPS violated EPPA.  Because LPS does not object, the request to amend will be granted and the arguments concerning the EPPA claim against LPS will be addressed herein.

Abreu argues that LPS qualifies as an employer within the meaning of the Act because it acted in the interest of the Co-op.  In certain cases, a polygraph examiner may qualify as an employer under EPPA.  *Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 726 (5th Cir. 2002). The determination of whether a polygraph examiner is an "employer" requires consideration of whether the examiner went beyond the role of an independent entity, to execute control as a matter of economic reality over the employer's compliance with EPPA.  *Rubin v. Tourneau, Inc.*, 797 F. Supp. 247, 252 (S.D.N.Y. 1992).  If the examiner is hired solely to administer an examination at the direction of the employer, the examiner, as a matter of economic reality, does not exert control over the employer's compliance with EPPA, and, is not subject to suit under EPPA.  *Id.*  Conversely, if the examiner determines such matters as who is to be tested and under what circumstances tests are permissible, the examiner would then be acting directly or indirectly in the employer's interest and would be subject to liability. *Id.*

---

[5] Defendants argument that they are entitled to EPPA's exemption for governmental employers is not well-taken because Abreu was not employed by the DAO.  *See* 29 U.S.C. § 2006(a).

When examining the degree of control necessary to treat a polygraph examiner as an employer for purposes of EPPA, the relevant factors are whether the examiner (1) decided that a polygraph examination should be administered; (2) decided which employee would be examined; (3) provided expertise or advice to the employer regarding compliance with EPPA's requirements, or the employer relied on the examiner to ensure compliance; or (4) decided whether the examined employee would be subjected to disciplinary action, or merely reported the results of the polygraph examination to the employer.  *Calbillo*, 288 F.3d at 727.

Abreu argues that Lucero decided that the polygraphs should be administered because Lucero informed Leger that he could only administer polygraphs for criminal investigations, and not for employment purposes.  Abreu reasons that, when Armijo called Lucero a few days later, Lucero should have assumed that Leger contacted the DAO for assistance for obtaining polygraphs of Co-op employees.  Abreu argues that the Co-op relied on LPS's advice on how to circumvent EPPA.  Abreu also relies on the fact that the Co-op paid for the polygraphs to establish that LPS was acting in the interest of the Co-op.

The fact that the Co-op paid for the polygraph examinations is not dispositive to the issue of whether LPS qualifies as an employer.  For instance, an employer is permitted to request an employee to submit to a polygraph test if the test is being administered in connection with an ongoing investigation involving such losses as theft and embezzlement.[6]  *See* 29 U.S.C. § 2006(d).  Although the employer pays for the polygraph examination in such cases, the examiner does not necessarily qualify as an employer.  *See Calbillo*, 288 F.3d at 727; *Rubin*, 797 F. Supp. at 252; *Kluge v. O'Reilly Automotive, Inc.* 1994 WL 409575 (D. Kan. 1994); *Fallin v. Mindis Metals, Inc.*, 865 F. Supp. 834

---

[6]  I express no opinion herein as to whether the Co-op qualifies for this exception.

(N.D. Ga. 1994).  Moreover, Lucero was not aware until after he conducted the tests and submitted his bill to the DAO that the Co-op would pay for the tests.  While the payment may be relevant to the question of whether the Co-op violated EPPA, it is not relevant to the issue of whether LPS qualifies as an employer within the meaning of § 2001(2).

LPS has submitted evidence that Lucero informed Leger that LPS could only administer the polygraphs in conjunction with a criminal investigation.  Lucero declined to work for the Co-op on two occasions.  Armijo set up the polygraph examinations and informed Lucero which individuals would be subjected to the tests.  Although Leger sent Lucero a schedule and arranged for a room for the tests, there is no evidence that LPS, as a matter of economic reality, exerted control over the Co-op's compliance with EPPA.  The record does not support Abreu's contention that LPS qualified as his employer under EPPA as alleged in Count VI.  In Count XIV, Abreu alleges that Lucero negligently facilitated the statutory violations of EPPA by permitting the polygraph examinations to take place.  Abreu has submitted no authority that distinguishes this claim from the EPPA claim alleged in Count VI.  Summary judgment will be granted in favor of LPS on Counts VI and XIV.

**D.      Whether Abreu is entitled to summary judgment against the Co-op on Count VI.**

Abreu argues that he is entitled to summary judgment on Count VI because the Co-op required him to submit to a polygraph test, the Co-op paid for the test, obtained the results, and terminated Abreu based on the polygraph tests in violation of EPPA.  The Co-op responds that the termination was not based on the polygraph results and that the Co-op passively cooperated with the police in the course of their investigation.  Genuine issues of material fact remain in dispute as to these issues.  *See Mennen v. Easter Stores*, 951 F.Supp. 838, 853 (N.D. Iowa 1997).  Accordingly, Abreu's motion for summary judgment on Count VI will be denied with respect to the Co-op.

**E.      Whether the Co-op is entitled to summary judgment on Counts I, II, and IV.**

In Counts I and II, Abreu asserts a breach of express employment contract and breach of implied employment contract claims, respectively.  In Count IV, he alleges breach of the implied covenant of good faith and fair dealing. The Co-op does not dispute that it had an employee handbook that gave rise to an implied contract of employment. The Co-op claims it is entitled to summary judgment because Abreu's attorneys delayed the pre-termination hearing and Abreu was terminated for insubordination at the hearing.  Genuine issues of material fact remain in dispute as to whether there was cause for the termination and whether proper procedures were followed with respect to the termination.  The Co-op's motion for summary judgment on Counts I, II, and IV will be denied.

**F.      Whether the Co-op is entitled to summary judgment on Abreu's claim for lost wages and benefits because Abreu failed to mitigate damages.**

The Co-op asserts that it is entitled to summary judgment barring recovery for lost wages and benefits because Abreu has failed to seek comparable employment.  Although the Co-op did not raise this affirmative defense it in its answer, failure to mitigate is identified as an issue in the Initial Pretrial Report ("IPTR").  The IPTR, submitted by the parties and signed by the Court, controls the subsequent course of this action.  *See* FED. R. CIV. P. 16 (c).  Therefore, the issue may be considered.

Mitigation of damages is an affirmative defense in breach of employment contract cases, and the employer bears the burden of proof to minimize damages.  *McGinnis v. Honeywell, Inc.*, 110 N.M. 1, 7, 791 P.2d 452, 458 (1990); *Bd. of Educ. v. Jennings*, 102 N.M. 762, 764, 701 P.2d 361, 363 (1985).  The Co-op must prove that Abreu failed to exercise reasonable diligence to minimize his damages by seeking the same type and grade of employment from which he was discharged.  *See*

*McGinnis*, 110 N.M. at 8, 791 P.2d at 459.  This is a question of fact that should be determined by the jury.  *Id*.  Because genuine issues of material fact remain on the issue of whether Abreu failed to mitigate damages, the Co-op's motion for summary judgment based on failure to mitigate damages will be denied.

**WHEREFORE,**

IT IS **ORDERED** that the DAO Defendants' Motion for Summary Judgment (Doc. 67), filed on October 13, 2003, is **GRANTED.**

IT IS **FURTHER ORDERED** the Co-op's Motion for Summary Judgment as to Counts I-V and X-XIII (Doc.50), filed on September 3, 2004, is **GRANTED AS TO COUNTS X-XIII AND DENIED AS TO COUNTS I, II, AND IV.**

IT IS **FURTHER ORDERED** LPS's Motion for Summary Judgment (Doc. 69), filed on October 13, 2004, is **GRANTED**.

IT IS **FURTHER ORDERED** that Abreu's Motion for Summary Judgment on Count VI Against the Co-op (Doc. 71), filed on October 14, 2004, is **DENIED.**

IT IS **FURTHER ORDERED** that the Co-op's Motion for Summary Judgment Barring Recovery of Damages for Lost Wages/Benefits Based on a Failure to Mitigate Damages (Doc. 54), filed on September 20, 2004, is **DENIED.**

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**